

**Signed January 31, 2011.**

_____
**H. CHRISTOPHER MOTT
UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| WARREN DRONEBARGER and | § | CASE NO. 10-10889-HCM |
| DORALEE CAROL DRONEBARGER. | § | Chapter 11 |
| Debtors | § | |

**MEMORANDUM OPINION
REGARDING OBJECTIONS TO CLAIMS OF
GREGORY L. WINBORN AND CHERUB ENTERPRISES, INC.**

Warren L. Dronebarger ("Dronebarger") and his spouse, Doralee Carol
Dronebarger, Debtors herein ("Debtors") filed an Objection to the Proof of Claim of
Gregory L. Winborn ("Winborn") and an Objection to the Proof of Claim of Cherub
Enterprises, Inc. ("Cherub"). In general, Winborn and Cherub (collectively "Claimants")
assert claims ("Claims") against the Debtors' estate in the amount of approximately

1

$519,130 based on a final judgment rendered by the state court in favor of Claimants against Debtor Dronebarger arising out of a lease guaranteed by Dronebarger. The Debtors' primary objections to the Claims are based on 11 U.S.C. §502(b)(6), a Bankruptcy Code provision which "caps" (or limits) damage claims against a bankruptcy estate resulting from termination of a real property lease.

On December 13, 2010, the Court conducted a hearing on the Debtors' objections to the Claims ("Objections"). The Court has considered and weighed the evidence, exhibits, pleadings, briefs, arguments of counsel, the record and legal authorities. The Court concludes for the reasons set forth herein, that the Objections to the Proofs of Claims based upon 11 U.S.C. §502(b)(6) must be denied.  The Court also concludes that Claimants are entitled to only "one satisfaction" (or "one recovery") from the bankruptcy estate based on the two Proofs of Claims.

The Court has jurisdiction over the Objections under 28 U.S.C. §§157 and 1334, and this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(B).  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (Bankruptcy Rules").[1]

---

[1] The Court requested both parties to submit proposed Findings of Fact and Conclusions of Law with respect to the Objections, prior to the Court issuing a ruling on the Objections.  The Court has specifically and individually considered each finding of fact and conclusion of law, and the findings and conclusions set forth in this Opinion are those reached independently by the Court after careful consideration of the evidence, record and applicable law.

## I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

On April 2, 2010, the Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

Through a series of transactions, Debtor Dronebarger became obligated to Claimants as a guarantor of a commercial real property lease and sublease. Claimant Winborn, as tenant and lessee, entered into a ground lease ("Prime Lease") dated June 1, 1998 with Nations Bank N.A., predecessor to Austin Trust Company, as Prime Lessor. The Prime Lease was for two lots located in downtown Austin, Texas, where a moveable commercial building was constructed to operate as a bar or restaurant (the "Property").   Winborn, as sublessor, then immediately entered into a Sublease Agreement dated February 1998 (the "SubLease") with Johnny A. Entertainment, Inc. ("JAE"), as sublessee, for the Property. In general, under the SubLease, JAE assumed all obligations of Winborn under the Prime Lease and owed certain other obligations to Winborn. Subsequently, by Assignment and Assumption of Sublease Agreement dated November 2, 1999, JAE assigned all its obligations under the SubLease to Millennium, Inc. ("Millennium").

Thereafter in February 2002, Debtor Dronebarger entered the picture.  Niteclubs Enterprises Inc. ("Niteclubs"), acting through its President Dronebarger, executed an Assignment and Assumption of Sublease Agreement and Letter of Agreement dated February 12, 2002 ("Assignment") with Millennium. In general, under the Assignment, all of the obligations of Millennium under the SubLease were assigned to Niteclubs as sublessee, Niteclub assumed all obligations under the SubLease as sublessee, and payments under the SubLease were directed to be made by Niteclubs to Claimant

3

Cherub. At the same time, on February 12, 2002, Dronebarger individually executed a Guaranty of SubLease (the "Guaranty"), whereby Dronebarger personally guaranteed all obligations of Niteclubs (as sublessee) under the SubLease and related agreements.

The SubLease, which was assumed by Niteclubs and personally guaranteed by Dronebarger, also required the sublessee (Niteclubs) to comply with and perform all obligations which the sublessor (Claimant Winborn), as tenant, owed to the Prime Lessor (Nations Bank, predecessor to Austin Trust Company) under the Prime Lease. Further, pursuant to the Assignment, Niteclubs assumed (and Dronebarger guaranteed) all obligations owed by the sublessee under the SubLease, which included the same obligations to Claimant Winborn which Winborn, as Tenant, owed to the Prime Lessor under the Prime Lease. The SubLease assumed by Niteclubs was also subject and subordinate to the terms of the Prime Lease.

The lease term (i.e., length) of the Lease and the SubLease were the same. Section 3.1 of the Prime Lease provided for a 60 month (5 year) lease term, and such lease term ran concurrently with the SubLease, according to section 1.01 of the SubLease (which provides that upon termination of the Prime Lease, the SubLease will terminate).   It was undisputed that the lease term under the Prime Lease commenced on June 1, 1998, and both the Prime Lease and SubLease expired 5 years later on June 1, 2003.  No evidence was provided to the Court (and no parties suggested) that the lease term was extended or renewed beyond June 1, 2003, or that the lease term was terminated prior to June 1, 2003.

Upon Niteclubs' execution of the Assignment in February 2002, Niteclubs assumed the remaining balance (approximately 16 months) of the original 5 year lease

term for the Property. As a result, Niteclubs' SubLease term expired on June 1, 2003. Further, the Final Judgment entered by the State Court in the litigation between the parties described below, reflects that under the Prime Lease, SubLease, and Assignment, all lease terms were in effect "through June 1, 2003".

Section 23.3 of the Prime Lease also contains a "No Surrender" clause, which provides that no act by landlord or tenant shall be construed as acceptance of any "surrender" of the Property by tenant or as any termination of the lease by the landlord, unless written notice of such intention signed by landlord is given to tenant. No evidence was provided to the Court, and it is apparently not disputed, that Claimants (or the Prime Lessor for that matter): (a) ever provided any written notice accepting any surrender of the Property by Niteclubs; or (b) ever provided any written termination of the Prime Lease, as set forth in section 23.3 prior to the expiration on June 1, 2003 of the stated lease term.   The conclusion that there was no early surrender or early termination of the term of the Prime Lease and corresponding SubLease is also buttressed by the State Court's finding in the Final Judgment that all lease terms were in effect "through June 1, 2003"—the stated lease term under the Prime Lease and corresponding SubLease.

As stated above, in February 2002, pursuant to the Assignment and related documents, Niteclubs assumed the SubLease and the Tenant's obligations under the Prime Lease. The obligations assumed by Niteclubs and guaranteed by Dronebarger included those set forth in section 17.1 of the Prime Lease. Section 17.1 of the Prime Lease contains the following provision regarding responsibility to repair and restore any

damage to the Property:

> Restoration.  If the Building is damaged or rendered totally or partially untenable by fire or other casualty, Tenant will repair or restore the Building to its condition prior to such fire or casualty **within six (6) months of the date of such fire or casualty.  Such casualty occurrence will not terminate this Lease** or result in any abatement of Rent. The proceeds of the pertinent insurance policy or policies, hereinabove mentioned, shall be applied to the cost of repairing or restoring the Building, and Tenant shall pay the balance, if any, of the cost of repairing or restoring same (emphasis added).

The obligations assumed by Niteclubs and guaranteed by Dronebarger also included the obligations set forth in section 3.02 of the SubLease, which contains the following provision:

> Surrender of the Premises. At the termination of this Sublease, by lapse of time or otherwise, Sublessee [Niteclubs] shall deliver the Premises to Sublessor [Winborn] in as good a condition as on the Commencement Date, excepting only wear and tear.

In July 2002, disaster struck. On July 9, 2002, the building on the Property apparently suffered damage during a storm and a portion of the building roof collapsed. Niteclubs was obligated to repair or reconstruct such damage or repair the Property within 6 months— i.e., by January 9, 2003--under the above cited section 17.1 of the Prime Lease.  Apparently Niteclubs began to reconstruct and repair the building on the Property. However, Niteclubs stopped its efforts, allegedly due to disputes with Claimants over insurance settlement proceeds.  In any event, it is undisputed that Niteclubs did not repair or restore the building on the Property by January 9, 2003.

Soon thereafter, the parties began a bitter, multi-year dispute over the Prime Lease, SubLease, Assignment, Guaranty, insurance and related transactions in State Court.  In 2003, Niteclubs filed suit against Claimants Winborn and Cherub in the 126th

District Court of Travis County Texas, cause no. GN 301009 (herein "State Court"). Winborn and Cherub counterclaimed against Niteclubs, and sued Debtor Dronebarger as a third-party defendant based on his Guaranty of Niteclubs' obligations. Declaratory relief as well as monetary relief was requested by the parties.

From August 3rd through 5th, 2009, the suit was tried before a jury. At the close of evidence, the State Court granted Claimants' motion for directed verdict. On December 18, 2009, the State Court entered a final judgment (herein "Final Judgment").

The Final Judgment denied all causes of action and relief sought by Niteclubs and Dronebarger against Claimants, and granted all causes of action and relief that Claimants sought against Niteclubs and Dronebarger. The Final Judgment awarded Claimants a judgment against Niteclubs and Dronebarger (based on his Guaranty), jointly and severally, of $251,000 in actual damages (which was stipulated to by the parties); $185,000 in attorneys fees; costs; pre-judgment and post-judgment interest; and declaratory relief.

The Final Judgment entered by the State Court was appealed by Niteclubs and Debtor Dronebarger, but no stay was obtained pending the appeal. Claimants filed abstracts and amended abstracts of judgment based on the Final Judgment. The Debtors then filed this Chapter 11 case on April 2, 2010. The Court has previously granted relief from stay for the appeal of the Final Judgment to proceed in the State Court judicial system. The appeal of the Final Judgment was pending at the time this Court conducted a hearing on the Debtors' Objections to the Claims in this bankruptcy case.

The two Proofs of Claim (herein "Claims") filed by Claimants Winborn and Cherub in this bankruptcy case are identical. Both Claims assert a claim in the amount of at least $519,130.84 based on the Final Judgment.  According to the amended abstract of judgment attached to the Claims, the amount of the $519,130.84 set forth in the Claims consists of (i) the $251,000 actual damage award in the Final Judgment; (ii) the $185,000 attorneys fees award in the Final Judgment; and (iii) $83,130.84 based on the pre-judgment interest award in the Final Judgment.

## II. LEGAL ANALYSIS

The Debtors have filed objections to the Proofs of Claim of Claimants on two grounds: (a) the two Proofs of Claim are duplicative and Claimants should only have one recovery; and (b) all or a portion of the Final Judgment forming the basis for the Proofs of Claim are for rent, and thus the amount of the Claims should be reduced or "capped" under 11 U.S.C. §502(b)(6).

### A. Are the Claims Duplicative?

The first ground for the Debtors' Objections to the Proofs of Claim—that the Proofs of Claim are duplicative--is easily addressed.  At the hearing on the Objections, Claimants' counsel stipulated that the Claimants are entitled to only "one satisfaction" on the two Proofs of Claim.

Further, both Proofs of Claim are based on the Final Judgment.  After examining the language in the Final Judgment and the record from the State Court trial placed into

evidence, this Court concludes that the State Court's award in the Final Judgment was in favor of Claimants jointly.

Accordingly, the Court determines that Claimants are entitled to only one recovery (or one satisfaction) from the Debtors' bankruptcy estate based on the two Proofs of Claim.

**B.  Are the Claims Subject to the Damage Limitation of §502(b)(6)?**

The second ground for the Debtors' Objections to the Proofs of Claim--that §502(b)(6) of the Bankruptcy Code limits (or "'caps") the allowable amount of the claims—requires considerably more analysis.

Section 502(b)(6) of the Bankruptcy Code provides, in pertinent part:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that…

(6) **if** such claim is the claim of a lessor for damages ***resulting from the termination of a lease*** of real property, such claim exceeds-

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of-

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6) (emphasis added).

**1. Is the Final Judgment of the State Court that is on Appeal Entitled to Full Faith and Credit in this Court?**

Although not expressly raised by the parties, the Court feels compelled to address the impact of the Final Judgment of the State Court in this Court. The effect of the Final Judgment relates to several issues in this contested matter, including the burden of proof and the applicability of §502(b)(6) of the Bankruptcy Code.

Under the Full Faith and Credit Act (28 U.S.C. §1738), this Court must give the findings of the State Court in the Final Judgment the same preclusive effect it would have in a Texas court. *In re Besing*, 981 F.2d 1488, 1494 (5th Cir.), *cert. denied*, 510 U.S. 821 (1993). Here, the Final Judgment was rendered in State Court litigation between the same parties now before this Court (Claimants and Dronebarger), the State Court expressly dealt with claims between the parties under the Prime Lease, SubLease, Assignment, Guaranty and related agreements and transactions, and there is no dispute that the State Court was a court of competent jurisdiction to enter the Final Judgment.

The fact that the Final Judgment of the State Court is pending on appeal does not change its preclusive effect. Stated simply, "[a] case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal." *Fidelity Standard Life Ins. Co. v. First Nat'l Bank & Trust*, 510 F.2d 272, 273 (5th Cir. 1975).

However, the preclusive effect does not prevent this Court from limiting the amount of damages set forth in the Final Judgment of the State Court under §502(b)(6) of the Bankruptcy Code. This is for the simple reason that the State Court did not have jurisdiction over the claims allowance process in bankruptcy and §502(b)(6) was not and

10

could not have been asserted or litigated by the parties in the State Court suit. *See e.g., In re Procare Auto. Serv. Solutions LLC,* 359 B.R. 653, 657-58 (Bankr. N.D. Ohio 2007) (applying Texas law).

Accordingly, the Court concludes that the Final Judgment of the State Court is entitled to full faith and credit in this Court, unless and until it is reversed on appeal. Such preclusive effect however, would not prevent the Court from limiting the amount of damages set forth in the Final Judgment under §502(b)(6) of the Bankruptcy Code if it is found to be applicable.

### 2.  Who has the Burden of Proof in this case?

The Debtors argue that the Claimants have the burden of proof under §502(b)(6) to establish what portion of the Final Judgment is attributable to damages for failure to repair and restore the building, and what portion is attributable to other damages that may be the subject of §502(b)(6). The Debtors assert that the Claimants have not met such burden of proof.  In support, the Debtors cite to *In re Blatstein,* No. 97-3739, 1997 WL 560119 (E.D. Pa. Aug. 26, 1997). [2]  However, the *Blatstein* court recognized that if a landlord files a claim for damages "***predicated upon such [lease] termination***, the landlord must prove and substantiate the claim as to both the incidence and measure of damages", citing to 4 Collier on Bankruptcy ¶¶ 502.03[7][c] [emphasis added] .

---

[2] The Debtors also cite the case of *In re Stock Bldg. Supply LLC*, 433 B.R. 360 (Bankr. Del. 2010) for the proposition that the burden of proof has shifted to the Claimants to establish their damages claim. However, the *Stock* case is inapplicable to our case.  In *Stock*, the lessor-claimant had expressly waived, in writing, any claim for lease rejection damages. The debtor objected to the claim based on such written waiver.  Thus, the court properly held that the debtor had met its burden of overcoming the prima facie validity of the claim, and the burden of proof shifted to the lessor-claimant to establish why its claim was valid in light of such waiver. 433 B.R. at 464. Here, the Claimants have not expressly waived any claims for damages, and in fact their claims are established by a Final Judgment of the State Court.

The Debtors' cited authorities do not specifically address which party has the burden to prove whether or not the damages are a result of "termination" of the lease under §502(b)(6), or the allocation of the amount of damages which are attributable to 'termination" of the lease. Here, Claimants' Proofs of Claim, which are based on the Final Judgment, are not "predicated" upon lease termination, and in fact Claimants affirmatively assert that their damages claims are <u>not</u> a result of termination of a lease subject to §502(b)(6).

Under Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and amount of the claim.  If the debtor or trustee objects to the claim, it is his burden to present sufficient evidence to overcome the prima facie effect of the claim. If the debtor or trustee succeeds in meeting this burden, then the creditor must prove the validity of the claim by a preponderance of the evidence.  *See e.g., McGee v. O'Connor (In re McGee),* 153 F.3d 258, 260 (5th Cir. 1998) (citations omitted) (finding that trustee did not meet its burden to overcome prima facie validity of properly filed proof of claim); *State Bd. of Equalization v. Official Unsecured Creditors Comm.* (*In re Fidelity Holding Co.),* 837 F.2d 696, 698 (5th Cir. 1988).

Here it is undisputed that the Claimants properly executed and filed their Proofs of Claim, which are based on and attach the Final Judgment against the Debtor. The burden is then on the Debtors (as the objecting party) to present "sufficient evidence" rebutting the prima facie effect of the claims, or else the Claimants will prevail.  It is only if sufficient evidence rebutting the claims is brought forth by the Debtors, that the Claimants must produce additional evidence to prove the validity of their claims by a

preponderance of the evidence.

Through their Proofs of Claim, Claimants have established a prima facie case against the Debtor's estate of the amount and validity of their claims. Such Proofs of Claim are based on the Final Judgment of the State Court, which sets forth a specific liquidated dollar amount of a claim against the Debtor. The Proofs of Claim filed by the Claimants, on their face, do not assert a claim for damages resulting from termination of a lease. In fact, the Claimants expressly deny that their claims are for damages resulting from termination of a lease of real property governed by §502(b)(6). It is therefore incumbent upon the Debtors, as the objecting party, to present sufficient evidence to overcome the prima facie effect of the Proofs of Claims.

The Debtors' Objections to the Proofs of Claim merely state that all or a portion the damages awarded in the Final Judgment are "for rent". The Debtors' Objections further assert (in substance) a "defense" based on §502(b)(6), which "caps" or limits a claim only if it is a "claim of a lessor for damages resulting from the termination of a lease of real property". It would seem that the Debtors, as the objecting party, should bear the initial burden of presenting sufficient evidence that the Proofs of Claim are for "damages resulting from the termination of a lease of real property" under §502(b)(6), and if so, how much of the claims would be for damages resulting from the termination of a lease.  Only if the Debtors meet such initial burden as the objecting party (i.e., that the claims are for damages resulting from the termination of a lease), does the burden of proof shift to the Claimants to establish that their claims are not subject to §502(b)(6), and if §502(b)(6) does apply, the amount Claimants can recover based on the cap limitations of §502(b)(6)(A) and (B).

This burden of proof approach is consistent with the statutory structure of §502. In substance, §502(b)(6) is a defense asserted by the Debtors to the Proofs of Claim. Section 502 starts with the proposition that if an objection to a claim is made, the court shall determine the amount of the claim and allow the claim in such amount (§502(b)), except to the extent that if the claim is made by a lessor "for damages resulting from the termination of a lease of real property" (§502(b)(6)), the claim "exceeds" the sum of the statutory cap of §502(b)(6)(A) and (B). Section 502(b)(6) is similar in structure to §502(b)(4), which provides that if a claim is for services of an insider or attorney for the debtor, such claim will be disallowed to the extent the claim "exceeds" the reasonable value of such services. Courts have found that under §502(b)(4), the claimant's burden is to prove the "reasonable value of the services", i.e., that its claim does not "exceed" such amount. *See In re Boulder Crossroads,* No. 09-10381, 2010 WL 4924745 at *12 (Bankr. W.D.Tex. Dec. 1, 2010) (citing *In re Siller,* 427 B.R. 872, 880-81 (Bankr. E.D. Cal. 2010)).

Accordingly, the Court disagrees with the Debtors' argument that the Claimants have the initial burden of proof to show that their claims are that of a "lessor for damages resulting from the termination of a lease of real property" under §502(b)(6) and the extent that such claims are for that type of termination damages. Instead, the Court believes the Debtors, as the objecting party, have the initial burden of proof to present evidence  that the Claimants' claims are that of a "lessor for damages resulting from the termination of a lease of real property" under §502(b)(6) and the extent that such claims are for that type of termination damages. This is particularly appropriate in this case, where the Claimants' prima facie proof is quite strong--a Final Judgment from

State Court against the Debtor for a fixed dollar amount stipulated to by the Debtor that is entitled to full faith and credit in this Court.[3]

The Court concludes that the Debtors have not met their initial burden of proof to present sufficient evidence that the Final Judgment (which is the basis for the Proofs of Claim) are claims by a "lessor for damages resulting from the termination of a lease of real property" under §502(b)(6), and the extent that such claims are for this type of termination damages. Alternatively, the Court concludes that the Claimants have in fact presented sufficient evidence to ultimately prove the validity of their Claims by a preponderance of the evidence, and that their Claims should not be disallowed or capped under §502(b)(6) for the reasons set forth herein.

### 3. Are the Claims for Termination Damages under §502(b)(6)?

The threshold issue is whether the Proofs of Claim of Claimants are "claims of a lessor for damages resulting from the ***termination*** of a lease of real property" under §502(b)(6) of the Bankruptcy Code. If the Proofs of Claim are not these types of "termination damages", then the statutory claims "cap" created by §502(b)(6)(A) and (B) do not apply.

The interpretation of the Bankruptcy Code starts "where all such inquiries must begin: with the language of the statute itself," according to the United States Supreme Court. *Ransom v. FIA Card Servs. N.A.*, No. 09-907, slip op. at p. 6 (Jan. 11, 2011)(citing *United States v. Ron Pair Enters., Inc.* 489 U.S. 235, 241 (1989)). In other words, a court begins with the understanding that Congress "says in a statute what it means and means in a statute what it says there." *Hartford Underwriters Ins. Co. v.*

---

[3] See discussion *supra* regarding the full faith and credit to be given to the Final Judgment.

*Union Planters Bank, N.A.* 530 U.S. 1, 6 (2000); *Camp v. Ingalls (In re Camp),* No. 09-50852, slip op. at p. 3 (5th Cir. Jan. 21, 2011) (citations omitted).

Therefore, when the statute's language is plain, "the sole function of the courts is to enforce the statute according to its terms" where the disposition required by the text is not absurd. *Ron Pair,* 489 U.S. at 241; *Union Planters,* 530 U.S. at 6. Courts "must give effect to every word of a statute wherever possible", and ensure that each word in a statute carries meaning. *Ransom*, slip op. at p. 8 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004); *Rake v. Wade,* 508 U.S. 464, 471 (1993). Effect is to be given to every word of a statute if possible, so that no portion of a statute is rendered redundant, inoperative, or superfluous. *Bank of Am. v. 203 LaSalle St. P'ship*, 526 U.S. 434, 452 (1999); *see also In re Luongo,* 259 F.3d 323, 340 (5th Cir. 2001).

Here, the language of the governing statute-11 U.S.C. §502(b)(6)-appears plain in the critical aspect. For a lessor's claim to be subject to its statutory cap, it must be a claim "for damages resulting from the termination of a lease of real property" under the statute. The key word in §502(b)(6) at issue in our case is "termination". For the statutory damages cap created by §502(b)(6)(A) and (B) to apply, the Claimants' claims must be for "damages resulting from the ***termination*** of a lease of real property".

The word "termination" is not expressly defined in the Bankruptcy Code. When and whether a lease has been "terminated" under §502(b)(6) is a question of state law. *See e.g., Eastover Bank v. Sowashee Venture (In re Austin Dev. Co.),* 19 F.3d 1077, 1083 (5th Cir.), *cert. denied*, 513 U.S. 874 (1994) (in the context of §365 of the Bankruptcy Code); *In re SKA! Design, Inc.*, 308 B.R. 777, 781 (Bankr. N.D. Tex. 2004) (in the context of §502(b)(6) of the Bankruptcy Code).

Under Texas law, for there to be a "termination" of a lease, it must be by the mutual agreement of the lessor and the lessee--that is, there must be a meeting of the minds. *Arrington v. Loveless*, 486 S.W. 2d 604, 607 (Tex. Civ. App.--Fort Worth 1972, no writ); *Barret v. Heartfield,* 140 S.W.2d 942, 944-45 (Tex.Civ.App.--Beaumont 1940, writ ref'd). A lease for a definite term requires no action for its expiration at the end of the term, as the lease "terminates" at that time automatically and by operation of its own provisions. *Hush Puppy of Longview, Inc. v. Cargill Interests, Ltd.*, 843 S.W. 2d 120, 122 (Tex. Civ. App.-Texarkana 1992, no writ)(citing *Bockelmann v. Marynick,* 788 S.W.2d 569, 571 (Tex.1990)). A lease may also be terminated under Texas law by the "surrender" of the leasehold interest. The landlord and tenant must mutually agree to surrender the lease, and the agreement may be express or implied. *See Arrington*, 486 S.W.2d at 607; *Edward Bankers & Co. v. Spradline*, 575 S.W.2d 585, 586-87 (Tex. Civ. App. –Houston [1st Dist.] 1978, no writ).

Here, the analysis of when and how the Prime Lease and corresponding SubLease guaranteed by Dronebarger "terminated" is relatively straightforward. The lease term under the Prime Lease and the SubLease were the same and ran concurrently--.both provided for a 60 month (5 year) lease term. The lease term under the Prime Lease commenced on June 1, 1998, and both the Prime Lease and SubLease expired 5 years later on June 1, 2003. Upon Niteclubs' execution of the Assignment in February 2002, Niteclubs assumed the remaining balance (approximately 16 months) of the 5 year lease term. As a result, Niteclubs' SubLease term expired on June 1, 2003. Accordingly, there was an express mutual agreement between the parties that the Prime Lease and corresponding SubLease "terminated" on

June 1, 2003, when the leases expired automatically at the end of their stated lease term. Further, there was no "surrender" causing an earlier termination of the leases; section 23.3 of the Prime Lease contains a "no surrender" clause and no evidence was provided showing that notice of early surrender was ever given under such section.

Accordingly, the Court concludes that the "termination" of the Prime Lease and corresponding SubLease occurred on June 1, 2003. The Court's conclusion is also supported by the declaratory relief granted in the Final Judgment, where the State Court found that all lease terms were in effect "through June 1, 2003".

Having crossed this initial bridge, the Court must address if the claims of Claimants are for damages "resulting from the termination" on June 1, 2003 of the Prime Lease and corresponding SubLease, and thus subject to the statutory cap of §502(b)(6)(A) and (B). Here, the claims of Claimants are established and evidenced by a Final Judgment rendered by the State Court against Dronebarger (the Debtor) and Niteclubs.

As stated above, this Final Judgment of the State Court is entitled to full faith and credit in this Court unless and until it is reversed on appeal. However, as many courts have found, a bankruptcy court may look beyond the face of a state court judgment to determine if the damage cap of §502(b)(6) applies to limit the amount of the judgment for the purposes of bankruptcy claim allowance. *See e.g., Procare*, 359 B.R. at 657-58 (applying Texas law); *In re Fulton*, 148 B.R. 838, 843-44 (Bankr. S.D.Tex. 1992).

Here, the $251,000 in actual damages awarded in the Final Judgment against Niteclubs and Dronebarger was based upon a stipulated amount that was agreed upon by the parties after the State Court advised the parties that it was going to grant a

directed verdict on liability in favor of Claimants. The parties submitted the $251,000 actual damage award to the State Court without any reference to the specific basis for underlying damages, other than the following statement made to the State Court: "we have agreed that the damages for the claims against Nightclubs (sic) and Mr. Dronebarger for breach of contract, lease agreement, and the guarantee are $251,000 plus whatever attorneys fees may be awarded".

In determining the basis for the $251,000 actual damage award set forth in the Final Judgment, the Court has examined the State Court pleadings that are part of the record. Claimants' counterclaim against Niteclubs and third party claim against Dronebarger under the Guaranty in the State Court suit sought damages for breach of the SubLease and Prime Lease based on: (i) Niteclub's failure to pay "back rent" for March, April and May 2003 totaling $19,500; (ii) Niteclubs' failure to maintain insurance in violation of section 16 of the Prime Lease, with no specification of the amount of damages; (iii) Niteclubs' failure to repair and restore the building on the Property in violation of section 17 of the Prime Lease, and sought as damages the value of the building; (iv) Niteclubs allowing a mechanics/materialmen's lien to be filed on the Property in violation of section 25 of the Prime Lease; (v) Niteclubs' failure to pay "additional charges" for late rent payments totaling $1,000; and (vi) consequential damages in an unspecified amount for breach of lease, including future loss of rental income from Niteclubs' failure to repair and maintain the building. Notably, Claimants' counterclaim and third party claim in State Court did not seek damages based on Niteclubs' obligation to deliver the Premises to Claimants in good condition at the "termination" of the SubLease, as provided for in section 3.02 of the SubLease.

Next, the Court has examined the record before it relating to the trial in State Court. According to the opening statements of counsel at the State Court trial placed into evidence in this Court, Claimants focused primarily on Niteclubs' failure to repair the building within 6 months as required by section 17.1 of the Prime Lease and argued that such failure rendered the building worthless. No mention was made of any violation by Niteclubs of section 3.02 of the SubLease (which required Niteclubs to deliver the Premises in good condition at the "termination" of the SubLease). Claimants' counsel also stated Claimants would be seeking damages for the value of the building and the value of the leasehold going forward.  According to the testimony from the State Court trial placed into evidence in this Court, Claimant Winborn testified on cross-examination that he was seeking damages for the "damage to my  building", "back rent" (less the security deposit), legal fees, and  loss of income from Claimant's inability to renew the lease due to the building not being restored.

It is clear that during the State Court trial, a substantial portion of the damages sought by the Claimants consisted of property damages due to Niteclubs' failure to repair and restore the building on the Property, as required under section 17.1 of the Prime Lease.  According to testimony at the State Court trial placed into evidence in this Court, Claimant Winborn estimated the cost of reconstructing the building on the Property to be approximately $500,000 to $600,000.  Winborn also testified in State Court that he had received insurance proceeds in the amount of approximately $242,051, which compensated Claimants for part of the amount of the property damages.  Accordingly, at trial in State Court, Claimants sought property damages in the range of approximately $258,000 ($500,000 minus $242,051) to $358,000

($600,000 minus $242,051) from Niteclubs and from Dronebarger (as guarantor of Niteclubs' obligations). Therefore, the evidence submitted during the State Court trial based on property damages was approximately $258,000 to $358,000, and thus exceeded the actual damage award of $251,000 stipulated to by the parties in the Final Judgment.

Significantly, these property damages of $258,000 to $358,000 sought by Claimants at trial were expressly based on Niteclubs' failure to repair the building within 6 months as required by section 17.1 of the Prime Lease. Such section required that Niteclubs repair or restore the building within 6 months of the date of a fire or casualty.[4] It is undisputed that the casualty (a storm causing damage to the building) occurred on July 9, 2002, and thus Niteclubs had the obligation to repair or restore the building by January 9, 2003 (within 6 months of the casualty).

Thus, the property damages of $258,000 to $358,000 sought by Claimants in State Court were as a result of a breach of the Prime Lease repair and restoration covenants on January 9, 2003—which was months before "termination" of the Prime Lease and Sublease on June 1, 2003. According to the plain language and meaning of §502(b)(6), the damages cap applies only to damages resulting from the "termination" of a real property lease. Since the "termination" of the Prime Lease and corresponding SubLease did not occur until June 1, 2003, the property damages sought by Claimant in State Court could not and did not result from "termination" of such leases.

In contrast to this significant property damage amount, the amount of unpaid rent sought by Claimants at the State Court trial was diminutive. According to testimony from

---

[4] Notably, section 17.1 of the Prime Lease also provides that a casualty occurrence (the storm causing damage to the building on July 9, 2002), will not "terminate" the lease.

the State Court trial placed into evidence in this Court and Claimants' counterclaims in State Court, Niteclubs was sued for the final 3 months of rent (March, April, and May of 2003) before the SubLease and Prime Lease expired on its own terms on June 1, 2003. These three months of unpaid "back rent" totaled approximately $25,700 according to testimony in the State Court trial, or totaled $19,500 according to Claimants' counterclaim filed in State Court. However, Claimant Winborn testified at the State Court trial that he had applied Niteclubs' security deposit to the unpaid back rent, and thus Claimant had received all but $700 in back rent.

Accordingly, based on the record before this Court, it appears that, at most, $700 in unpaid rent was sought by Claimants from Niteclubs (and Dronebarger based on his Guaranty) at trial in State Court.  In any event, the "unpaid rent" sought in the State Court suit was not a result of "termination" of the Prime Lease and corresponding SubLease on June 1, 2003; instead it was rent that was due and owing for the months prior to termination of such leases on June 1, 2003.

At the State Court trial, Claimant Winborn's testimony included some asserted damages predicated upon "loss of income" from Claimant's inability to renew the lease due to the building not being restored. With respect to loss of income for inability to renew the lease, Winborn's testimony was far from clear. First, Winborn testified at trial he was seeking 15 years worth of lost income, which in his words is "over a hundred thousand dollars" at $2,000 a month for 180 months. On further cross-examination, Winborn admitted that in his deposition he testified that his damages were for 5 years of lost income (which would be $120,000 based on $2,000 a month for 60 months).

Regardless of how one interprets Winborn's State Court testimony, a few things are clear. First, any "loss of income" damages claim was tied to Niteclubs' failure to restore and repair the building within 6 months (i.e, by January 9, 2003) as required by the Prime Lease.  Thus, such alleged damages were not a result of "termination" of the Prime Lease which occurred on June 1, 2003.  Second, the dollar amount of the alleged "loss of income" damages was estimated at trial as over $100,000 and $120,000. This amount would appear to be less than the clear property damages testimony of $258,000 to $358,000, which was not in any way, shape or form a result of termination of the lease. Third, the alleged "loss of income" damages were not and could not be for "future rent" under the Prime Lease and corresponding SubLease.  Such leases terminated on June 1, 2003, and the obligation to pay rent after June 1, 2003 ended on such date with expiration of the stated lease term.

In sum, from reviewing the entire State Court record placed into evidence in this Court, the central issue in the State Court suit was about the obligations of Niteclubs (which were guaranteed by Dronebarger) to repair or restore the building on the Property. Several other related issues were drawn into the litigation, including entitlement and use of insurance proceeds to repair the building and smaller dollar figure claims, but the predominant legal and damages issue was whether Niteclubs had breached its duty and obligation to repair and restore the building under the terms of the Prime Lease.  The State Court found that Niteclubs had in fact breached such duty to repair and restore the building. The Prime Lease required that property damage be repaired and restored by January 9, 2003—months before termination of the Prime Lease on June 1, 2003.

Accordingly, the Court concludes that the actual damages award of $251,000 in the Final Judgment are not damages "resulting from the ***termination*** of a lease" within the scope of §502(b)(6). To hold otherwise would require the Court to eliminate the modifying word "termination" from the language of §502(b)(6), which the Court cannot do. If Congress had intended an interpretation of §502(b)(6) that would remove the modifier "termination" from the statutory phrase "damages resulting from ***termination*** of a lease", Congress would have simply omitted the word "termination" . The statutory language would then have read "damages resulting from a lease". To ignore the word "termination" in the statute would be contrary to the Court's interpretive obligation to "try to give meaning to all the statutory language". See *LaSalle*, 526 U.S. at 452 (refusing to interpret §1129(b)(2)(B)(ii) in a manner so as to not give meaning to the modifier "on account of"); *Ransom*, slip op. at p. 8 (courts should "give effect to every word of a statute wherever possible"). [5]

Consideration of the underlying purposes of the §502(b)(6) damages limitation strengthens the Court's conclusion that §502(b)(6) does not apply to the Claims at issue. Section 502(b)(6) was "designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate". S. Rep. 95-989, 95th Cong. 2d Sess. 63, reprinted in 1978 U.S.C.C.A.N. 5787, 5849. Through §502(b)(6), Congress intended to compensate landlords for their actual damages while placing a

---

[5] Primarily based upon the proximity in time of Niteclubs' breach of the repair and restoration covenant in the SubLease in January 2003 and the expiration of the SubLease term in June 2003, the Debtors argue that the Claimants' damages are sufficiently related to the termination of the SubLease, "temporally as well as substantively", that they should be subject to the termination damages cap of §502(b)(6). The Court finds such argument to be unpersuasive, as it would constitute a triumph of language over truth.

limit on large speculative damages which would displace other creditor's claims. *In re Highland Superstores, Inc.*, 154 F.3d 573, 577 (6th Cir. 1998). The drafters of §502(b)(6) were primarily concerned with limiting a landlord's claim for "future rent", and not claims arising from pre-bankruptcy events. *See e.g.*, *In re Atlantic Container Corp.*, 133 B.R. 980, 988 (Bankr. N.D. Ill. 1991). Congress intended to "compensate landlords for their actual damages" while requiring "a limited sacrifice" of future damages arising from large prospective and speculative claims for future unpaid rent from the rejection of a long-term lease. *See e.g., In re Vause*, 886 F.2d 794, 801-02 (6th Cir. 1989); *In re Best Products Co., Inc.,* 229 B.R. 673, 675-76 (Bankr. E.D. Va. 1998); *Atlantic Container,* 133 B.R. at 987-88.

In applying the underlying purposes of §502(b)(6) here, the Claims represented by the Final Judgment are not based on a "long-term" lease.  Instead, the Prime Lease and corresponding SubLease, when assumed by Niteclubs and guaranteed by Dronebarger, had only approximately 16 months remaining in the term (February 12, 2002 through June 1, 2003).

Similarly, due to the short-term nature of the leases which expired years ago (June 1, 2003), there could be no "future rent" claims being asserted against the Debtors' bankruptcy estate based on the Final Judgment. Only a small amount of the Final Judgment could conceivably be for rent ($700), and it would be for rent due prior to termination of the leases on June 1, 2003 and thus cannot be considered "future rent".

Nor are the Claimants' damages "speculative" in any sense, as the damages are represented by a Final Judgment which contains a stipulated amount of actual damages

agreed to by the Debtor. Claimants' damages are based on pre-bankruptcy events that happened years before the Debtors' bankruptcy filing.

Further, according to the Debtors' Plan of Reorganization and Disclosure Statement currently on file with the Court, the Debtors propose to pay unsecured creditors 100% of their claims even if the Claimants' claims are allowed in full.  Thus, one of the overriding policies behind the §502(b)(6) damages cap—not permitting a landlord's claim to be so large as to prevent general unsecured creditors from receiving a dividend—is apparently not implicated here.

Finally, the Claims at issue do not arise as a result of "rejection" of the Prime Lease and corresponding SubLease during the Debtors' bankruptcy case. Instead, the leases at issue expired and terminated years before the Debtors' bankruptcy filing, and there was no lease to "reject" under §365 of the Bankruptcy Code in this bankruptcy case.

For any and all of these reasons, the underlying purposes of the §502(b)(6) damages cap are not served by limiting the amount of the Claimants' claims represented by the Final Judgment in this bankruptcy case.

Just as importantly, many courts have found that the damages limitation of §502(b)(6) does not apply to damages arising from pre-bankruptcy physical damage to or failure to repair  leased property. *See e.g., In re El Toro Materials, Inc.*, 504 F.3d 978, 981-82 (9th Cir. 2007), *cert. denied*, 552 U.S. 1311 (2008); *Best Products,* 229 B.R. at 678-79; *Atlantic Container,* 133 B.R. at 987-88. In *El Toro,* the Ninth Circuit held that a lessor's claim for pre-bankruptcy property damage to the leased premises by the debtor-lessee was not subject to the damage cap of §502(b)(6), and was consistent with

the purpose of §502(b)(6) which was to limit "rent" (not property damage) claims. 504 F.3d at 980-81. In *Atlantic Container,* the court held that damages caused to the premises by the debtor's failure to fulfill its repair and maintenance obligations under a lease was unrelated to "termination" of the lease and not subject to the §502(b)(6) damage cap. 133 B.R. at 987.

As set forth above, the root of the actual damages award in the Final Judgment was based on Niteclubs' breach of its duty and obligation (which Dronebarger guaranteed) to repair and restore the damaged building under the terms of the Prime Lease. This property damage occurred in July 2002 and the breach of the repair covenant occurred in January 2003-- *months before* the lease terminated in June 2003 and *years before* the Debtors' bankruptcy filing in April 2010. Accordingly, ample case law supports this Court's conclusion that the §502(b)(6) damage limitation does not apply to the claims made by the Claimants under the Final Judgment.

Finally, this Court's conclusion that §502(b)(6) does not apply to the Claims is buttressed by the Fifth Circuit's reminder of "our duty to avoid reading broadly provisions such as §502(b)(7)". *In re Goforth*, 179 F.3d 390, 395 (5th Cir. 1999). Section 502(b)(7) (which places a statutory cap on employee claims for termination of employment agreements) is very similar in structure and language to §502(b)(6) at issue in the case at bar (which places a statutory cap on lessor claims for termination of leases). Accordingly, this Court should not read the applicability of §502(b)(6) and its damages limitation broadly, as it would interfere with a strong bankruptcy policy of ratable distribution to all creditors. *Goforth,* 179 F.3d at 395, citing *Vanston Bondholders*

*Protective Comm. v. Green,* 329 U.S. 156, 161 (1946)*; Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 435 (5th Cir. 1994).

The Debtors strenuously argue that this Court should reach the same conclusion as the court did in *In re Mr. Gatti's, Inc.,* 162 B.R. 1004 (Bankr. W.D. Tex. 1994) and apply the cap of §502(b)(6) to Claimant's claims for property damage and breach of repair covenants. However, *Mr. Gatti's* is very distinguishable from our case based on its clear factual setting and holding.

In *Mr. Gatti's,* the court was confronted with a lease that was "unexpired" (i.e, still in effect) at the time of the bankruptcy filing and had been "rejected" by the debtor during the bankruptcy under §365 of the Bankruptcy Code. There, the court was forced to address whether a lessor's claim for damages, based on breach of repair and maintenance lease covenants resulting from rejection of the lease, was subject to the cap of §502(b)(6). In sharp contrast, here there was and could be no rejection of the Prime Lease and corresponding SubLease under §365 of the Bankruptcy Code, as such leases had expired according to their terms on June 1, 2003--almost 7 years before the bankruptcy filing of the Debtors. *See* 11 U.S.C. §365(a) (providing for rejection of "unexpired" leases).   Moreover, here the Debtors could not have rejected the Prime Lease and SubLease even if they had not expired, as the Debtors are not the lessee under such leases that would be entitled to reject the leases. *See* 11 U.S.C. §365(a) (providing for rejection of unexpired leases of the "debtor").   Indeed, the narrowness of the court's holding in *Mr. Gatti's* is demonstrated by its statement of the issue and conclusion of law-"Section 502(b)(6) limits a landlord's claim against the

bankruptcy estate once a debtor **rejects a previously unexpired lease** of real property" (emphasis added). 162 B.R. at 1007, 1013.

Substantively, the court in *Mr. Gatti's* focused on the use of the terms "rejection" and "termination" in the Bankruptcy Code. The court ultimately concluded that "rejection" of an unexpired lease is, in a very real and practical sense, a "termination" of the lease by the debtor; and thus the rejection damages asserted by a lessor (including damages for failure to perform repair covenants) would be subject to the cap of §502(b)(6). 162 B.R. at 1012. The court in *Mr. Gatti's* did not hold that "termination" of a lease was the same as "rejection" of the lease. This distinction is important, as "termination" of a lease can occur prior to a bankruptcy case, as it did in our case when the Prime Lease and SubLease expired according to its stated term years before the bankruptcy.[6]

The *Mr. Gatti's* court also reasoned that damages are "caused" by a tenant's "actual" non-performance of its lease obligations, and when a debtor "rejects" an unexpired lease, the debtor is rejecting its "future performance" of all of the covenants contained in the lease, including its obligation to repair and maintain the leased premises. *Id.* In the case at bar, the damages were "caused" in 2003 (years before the bankruptcy) when the lessee (Niteclubs) "actually" breached its obligation to repair and restore the building under the Prime Lease, and is not in any way linked to some "future performance" of the covenant by Niteclubs. In sum, the Court's decision in this case does not conflict with the holding or rationale of the court in *Mr. Gatti's*.

---

[6] Indeed, the Fifth Circuit has recognized the distinction, and has held that "rejection" of a lease is not the same as "termination" of a lease. *In re Austin Dev.*, 19 F.3d at 1082.

The State Court also awarded Claimants their attorneys fees in the total amount of $185,000 against Dronebarger and Niteclubs.  According to the Final Judgment, the attorneys fees were reasonable and necessary and were awarded to Claimants as the prevailing party and for successful defense of declaratory judgment claims. The grounds set forth in the Final Judgment for such attorneys fees award included the contractual attorneys fees provisions in the SubLease and Guaranty,  Chapter 38 of the Texas Civil Practices and Remedies Code (which deals with breach of contract), and Chapter 37 of the Texas Civil Practices and Remedies Code (which deals with declaratory relief). In their state court pleadings, Claimants sought recovery of their attorneys fees under the Sublease and §38.001 of the Texas Civil Practices & Remedies Code, and declaratory relief.  Finally, the Final Judgment awarded Claimants pre-judgment interest at $34.38 per day from May 5, 2003 through the date of the Final Judgment on December 18, 2009, post-judgment interest at 5% per annum, and all taxable costs.

The attorneys fees award in the Final Judgment was based on Claimant's successful pursuit of the underlying actual damage claim and declaratory relief claim. The record does not demonstrate that the attorneys fees award were damages resulting from "termination" of the Prime Lease or corresponding SubLease. The attorney fees were awarded for successful recovery of the actual damages of $251,000 and are based on the breach of contract (leases and guaranty). This Court has already found that the actual damages in the Final Judgment are not subject to the cap of §502(b)(6), and thus the attorneys fees award, which is derivative of the actual damage award, are not limited by §502(b)(6).

The attorneys fees were also awarded to Claimants in the Final Judgment for successful pursuit and defense of the declaratory judgment claims in State Court. Such declaratory relief claims are not damages, and furthermore the declaratory relief was not requested as a result of "termination" of the Prime Lease and corresponding SubLease. Since the attorneys fees are also derivative of the declaratory relief granted in the Final Judgment, they are not subject to the cap of §502(b)(6).

Accordingly, the Court concludes that §502(b)(6) does not apply or cap the attorneys fees award to Claimants in the Final Judgment, as the attorneys fees are not "damages resulting from the termination" of the leases under §502(b)(6). *See generally Travelers Cas.& Sur. Co. v. Pac. Gas & Electric Co.*, 549 U.S. 443, 449-50 (2007) (noting that since creditor's claims for attorneys fees had nothing to do with "damages resulting from the termination of a lease" under §502(b)(6), the attorneys fees claim must be allowed unless the claim was unenforceable under §502(b)(1)). Similarly, since the pre-judgment and post-judgment interest awards in the Final Judgment are derivative of the actual damage award which the Court has found is not subject to the cap of §502(b)(6), the Court concludes the interest award is not subject to reduction by §502(b)(6).

In sum, for any or all of the foregoing reasons, the Court holds that the claims of Claimants represented by the Final Judgment are not claims for damages "resulting from the termination" of a lease of real property under §502(b)(6).  Accordingly, such claims are not subject to the limitation or cap provided by §502(b)(6)(A) and (B).

### 4. Does §502(b)(6) Apply to a Debtor-Guarantor of a Lease?

Claimants also argue that §502(b)(6) does not apply to their Claims because here the Debtor (Dronebarger) is a ***guarantor*** of lease obligations, rather than a lessee under a lease. In support, Claimants cite to the Fifth Circuit decision of *In re Goforth*, 179 F.3d 390, 394-95 (5th Cir. 1999), as well as other cases such as *In re Danrik, Ltd.*, 92 B.R. 964, 972 (Bankr. N.D. Ga. 1988). Claimants argue that the Debtor (Dronebarger) was not a party to a lease with Claimants, rather the Debtor was a guarantor of the obligations of Niteclubs, which was the lessee and sublessee under the SubLease and corresponding Prime Lease. Further, Claimants argue that the Final Judgment entered against the Debtor Dronebarger was entered against him in his capacity as a guarantor of lease obligations under the Guaranty, not as a result of any lease with him individually.[7] To thin-slice Claimants' argument, it could simply be stated—Claimants' claims against the Debtor are not based on a "lease" under §502(b)(6); instead their claims are based on a "guaranty".

Although Claimants are clearly correct in their factual assertions in this regard— Debtor Dronebarger was indeed a guarantor of and not a lessee under the SubLease and corresponding Prime Lease, and the Final Judgment was rendered against him as a guarantor of (not lessee under) such leases—it is not clear that §502(b)(6) does not apply to the claims because the Debtor is liable as a guarantor under the Guaranty.

The primary legal authority relied upon by Claimants for its argument is the Fifth Circuit case of *Goforth.* 179 F.3d at 390. There, the Fifth Circuit addressed the claim of an employee (Hall) that was asserted against the individual bankruptcy estate of the

---

[7] It may be noted that the Guaranty executed by Dronebarger provides that Dronebarger's liability under the Guaranty "shall not be limited" by section 502(b)(6) of the Bankruptcy Code.

president (Goforth) of a corporate employer (Teleometrics). The parties stipulated that part of the claim of Hall at issue derived from an employment agreement. The employee Hall had obtained an arbitration award and state court judgment against the employer Teleometrics and the debtor Goforth jointly and severally. Hall's judgment against the debtor individually was not based on a guaranty of the employer Teleometrics' obligations under the employment agreement, and instead appears to have been based on some other theory of wrongful termination liability. 179 B.R. at 391-93.

The debtor in *Goforth* argued that Hall's claim against his individual bankruptcy estate should be limited (or capped) under §502(b)(7) of the Bankruptcy Code.[8] As noted above, §502(b)(7) is very similar in structure and language to §502(b)(6) at issue in the case a bar. In pertinent part, §502(b)(7) places a cap (or limit) on a "claim by an employee for damages resulting from the termination of an employment contract". Similarly, §502(b)(6) places a cap (or limit) on a "claim of a lessor for damages resulting from termination of a lease of real property".  The lower courts in *GoForth*, which found that §502(b)(7) did not apply to Hall's claim against the debtor, had read into the §502(b)(7) the requirement that the claimant (Hall) must be an employee "of the debtor". Accordingly, the lower courts reasoned that since the claimant Hall was not an employee of the debtor Goforth (Hall was an employee of Teleometrics), §502(b)(7) and its damages cap did not apply to the claim. 179 B.R. at 393.

In *Goforth*, the Fifth Circuit acknowledged that the "plain language" of the statute supported the debtor's position, and that the language of §502(b)(7) does not state that

---

[8] The Debtors argue that *Goforth* is completely inapplicable to this case, because in *Goforth* the debtor was not in bankruptcy and thus no claim was being made against a bankruptcy estate. This is simply not accurate, as the individual debtor in *Goforth* was in his own individual bankruptcy proceeding and the claim was litigated in such individual bankruptcy proceeding. 179 B.R. at 392.

it applies only when the debtor (Goforth) is the actual employer of the claimant (Hall). Notwithstanding this acknowledgment, in *Goforth* the Fifth Circuit ultimately held that §502(b)(7) did not apply to limit the claim of the claimant Hall against the debtor. 179 B.R. at 393, 395.  The Fifth Circuit stated " a state court judgment …finding that Goforth is jointly and severally liable for amounts due under two agreements, only one of which was an employment agreement, does not entitle Goforth to take advantage of the limitation of §502(b)(7). Goforth was not Hall's employer, and is more like a guarantor". 179 B.R. at 395.

This statement of the Fifth Circuit seems to fit neatly into the factual setting of the case at bar—Debtor Dronebarger is jointly and severally liable under a state court judgment and is a guarantor. Of course, since the Fifth Circuit in *Goforth* was addressing the applicability of  §502(b)(7) (and not  §502(b)(6) which governs our case), and the debtor Goforth was not in fact a guarantor, the Fifth Circuit's statement as applied to our case could be considered dictum. However, it is very strong dictum, for the following reasons.

First, the grammatical structure of §502(b)(7) and §502(b)(6) are virtually identical.[9] The Fifth Circuit and lower courts in *Goforth* interpreted the language of §502(b)(7) as requiring that the debtor be the "employer" of the claimant employee to obtain the benefit of the damage limitation of §502(b)(7). This interpretation fits tidily into §502(b)(6) as well, which in turn would require that the debtor be the "lessee" of the

---

[9]  Indeed, the Fifth Circuit in *Goforth* noted that §502(b)(6) is a "comparable provision" to §502(b)(7). 179 B.R. at 394-95 (citing *In re Danrik, Ltd.*, 92 B.R. 964, 972 (Bankr. N.D. Ga. 1988)). Further, the legislative history of §502(b)(7) demonstrates that it was intended to "track…the landlord limitation on damages provision" of §502(b)(6). H. Rep. No. 595, 95th Cong. 1st Sess. 354 (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 64-5 (1978); see also *Johnson v. Beck (In re Johnson),* 117 B.R. 461, at 467-68 (Bankr. Minn. 1990).

claimant lessor to obtain the benefit of the damage limitation of §502(b)(7). Here the Debtor Dronebrger was clearly not the lessee, Niteclubs was the lessee.

Second, the Fifth Circuit stated repeatedly in *Goforth* that the debtor was "similar" to or "more like" a guarantor, since the debtor was responsible for damages that are not recoverable from the corporate employer. The Fifth Circuit also relied heavily on the reasoning in *Johnson v. Beck (In re Johnson),* 117 B.R. 461, 470 (Bankr. Minn. 1990), which squarely held that a guarantor is not entitled to the damage limitation of §502(b)(7).  179 B.R. at 395. Here, Debtor Dronebarger is clearly a guarantor, and is responsible for damages that may not be recoverable from the corporate lessor (Niteclubs).

Third, the Fifth Circuit in *Goforth*  found support for its decision in the case of *In re Danrik, Ltd.*, 92 B.R. 964, 972 (Bankr. N.D. Ga. 1988).  In *Danrik*, the court held that §502(b)(6) did not apply to limit the claims of a landlord-lessor against a guarantor-debtor—which is essentially the same facts and the identical statutory provision present in our case.

Fourth, the Fifth Circuit in *Goforth*  recognized that there was contrary authority— that many courts had held that the damage cap of §502(b)(7) and §502(b)(6) did apply to debtor-guarantors—yet the Fifth Circuit still held that the damage cap of §502(b)(7) did not apply to a guarantor-like debtor. 179 B.R. at 395.

Finally, in reaching its conclusion that §502(b)(7) did not apply to a guarantor-like debtor in *Goforth*, the Fifth Circuit stated that it was "mindful of our duty to avoid reading broadly provisions such as §502(b)(7)" for bankruptcy policy reasons.  179 B.R. at 395 (citations omitted).  Here, the statutory provision at issue in our case (§502(b)(6)) serves

a similar purpose to §502(b)(7), as they both limit claims to which a creditor would otherwise be entitled. Thus it can be forcefully argued that §502(b)(6) should not be broadly construed and made applicable to a debtor-guarantor like the Debtor Dronebarger in our case.

Thus, this Court is convinced that if in 1999 (the year that *Goforth* was decided), the Fifth Circuit had addressed our issue—i.e., whether a guarantor-debtor of a lease was entitled to limit termination damage claims under §502(b)(6)—it would have concluded that §502(b)(6) did not apply. The Court will briefly examine whether anything in the statute or governing case law has changed with respect to §502(b)(6) in the last 12 years since *Goforth* was decided by the Fifth Circuit. Sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code have not been amended since 1999. *Goforth* has not been overturned (or even criticized) by the Fifth Circuit since the decision was issued. Neither the Fifth Circuit nor the United States Supreme Court has addressed the issue regarding whether the damage caps of §502(b)(6) (or §502(b)(7) for that matter) applies to a guarantor-debtor.

However, the Debtor urges this Court to follow a Texas bankruptcy court's decision that post-dated *Goforth*, and apply §502(b)(6) to limit claims against a debtor-guarantor like Dronebarger.[10] *In re Lincoln*, No. 05-14396 (Bankr. W. D. Tex. June 26, 2006) (unpublished).

In *Lincoln*, the court held that a debtor-guarantor was entitled to apply the damage limitation of §502(b)(6) to a lessor's claim based on the facts presented.

---

[10] The Debtors also cite other cases for the proposition that §502(b)(6) applies to limit claims against a debtor-guarantor of a lease. However, many of these cases were decided before *Goforth* (where the Fifth Circuit recognized there was contrary authority)*,* and in any event are not binding precedent.

However, in *Lincoln*, the debtor was in chapter 13 and was proposing to pay a "minimal dividend" to unsecured creditors. The court based its decision in part on the legislative policy of §502(b)(6)—to not permit a landlord a claim so large that it would prevent other general unsecured creditors from recovering a dividend from the estate. *Lincoln* at pp. 2, 5. The *Lincoln* court also recognized that the *Danrik* decision (which held that the damage limitation of §502(b)(6) did not apply to a debtor-guarantor of a lease), was based on a distinguishable situation where the debtor-guarantor was paying all other creditors in full under its plan of reorganization. *Lincoln* at p. 8 (citing *Danrick* , 92 B.R. at 967). The *Lincoln* court also concluded that the lessor's claim, if allowed and not limited by §502(b)(6), would be "burdensome"  on other creditors in the Chapter 13 bankruptcy case as it would unduly "dwarf" other unsecured creditors' claims. *Lincoln* at p. 10. Thus, on a bankruptcy policy and factual basis presented in *Lincoln*—where the lessor's damages claims would significantly dilute distribution to unsecured creditors-- the court applied the damages cap of §502(b)(6) to limit the lessor's claim against the guarantor-debtor. *Lincoln* at p. 10.

These are not the facts in our case, and the bankruptcy policy implications relied upon by the *Lincoln* court are not present here.  According to the Debtors' Chapter 11 Plan of Reorganization and Disclosure Statement currently on file with the Court, the Debtors propose to pay unsecured creditors 100% of their claims even if the Claimants' claims are allowed in full.  Apparently, the party that would benefit from applying the §502(b)(6) damages cap in our case would not be other creditors, it would be the Debtors. Thus, the economic and policy concerns which drove the court in *Lincoln* to apply the §502(b)(6) cap to a guarantor-debtor do not appear to exist in this case.

The court's decision in *Lincoln* was also based on the "plain language" of the statute—i.e., §502(b)(6) does not limit its application to a debtor that is a "lessee". This Court might well agree with and follow this interpretation, if it were writing on a completely clean slate and presented with a factual setting like that in *Lincoln*. However, this Court is not writing on a completely clean slate. *Goforth* took an almost identical provision of the same statute (§502(b)(7))--recognized the "plain meaning" rule—and held that the damage cap did not apply to a guarantor-like debtor.  In addition, the bankruptcy policy behind the §502(b)(6) limitation on a damages claim by a lessor do not appear to be served by applying the limitation to this Debtor's case (like they were in *Lincoln*).

The *Lincoln* court aptly phrased the question and answer as follows: *"Does this (the decision in Goforth) mean that the 5th Circuit would therefore apply its §502(b)(7) rationale to a debtor-guarantor in a §502(b)(6) case? We really do not know"* (added). This Court does not "really know" how the Fifth Circuit would rule if presented with the issue in our case. But for the reasons set forth above, and based on the facts of our particular case, this Court believes that the Fifth Circuit would not apply the damage cap of §502(b)(6) to the claims of Claimants against the Debtor, as guarantor.

Accordingly, in the event that the damages sought by Claimants against the Debtor are determined to be "resulting from termination" of a lease, the Court alternatively holds that §502(b)(6) still does not apply to bar or limit the damages sought by Claimants against the Debtor as a guarantor.

### III. __CONCLUSION__

In conclusion, the Court holds that the claims of Claimants represented by the Final Judgment are not claims "of a lessor for damages resulting from the termination of a lease of real property" within the scope of §502(b)(6).  The Court  makes such holding on three alternative grounds—the Debtors have not met their burden of proof; the claims represented by the Final Judgment are not damages resulting from the "termination" of a lease; and §502(b)(6) does not apply, based on the facts in this case, to the Debtor since he is a guarantor of a lease.  As the claims of Claimants do not fall within the scope of §502(b)(6), they are not subject to the damage limitation (or cap) provided by §502(b)(6)(A) and (B). Accordingly, the Debtors' objections to the Proofs of Claim based upon §502(b)(6) are denied.

The Court also holds that Claimants are entitled to only one recovery (or one satisfaction) from the Debtors' bankruptcy estate on their two Proofs of Claim which are based on the Final Judgment.  Accordingly, the Debtors' objections that the Proofs of Claim are duplicative are granted to this extent.

Finally, the Court makes no ruling regarding the substantive validity of the underlying claims of Claimants against the Debtor that is represented by the Final Judgment of the State Court. The Debtor has appealed the Final Judgment and the appeal apparently remains pending in the State Court judicial system.  None of the Court's findings or conclusions herein shall be binding upon or have any preclusive effect in the State Court judicial system. However, the Final Judgment is and will be entitled to full faith and credit in this Court, unless and until such Final Judgment is reversed on appeal.

An Order on the Debtors' Objections to the Proofs of Claim of Claimants will be entered contemporaneously herewith that incorporates this Memorandum Opinion.

#####